IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTHONY LAMONT WILLIAMS | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO. JFM-05-2747 |
| | | CIVIL ACTION NO JFM-05-2491 |
| FRANK C. SIZER, COMMISSIONER, | * | (Consolidated Cases) |
| KATHLEEN GREEN, WARDEN | | |
| CORRECTIONAL MEDICAL SERVICES, | * | |
| INC. | | |
| DR. RAZAAK ENIOLA | * | |
| RUTH ANN RUTTIG | | |
| SUZANNE B. EDER | * | |
| ROBIN BLONDEAUX | | |
| CHARGE NURSE ROSEMARY | * | |
| BRYANT[1] | | |
| DR. SEYED JALALI | * | |
| JENNIFER DALY | | |
| Defendants. | * | |
| | *** | |

## MEMORANDUM

Procedural History

Plaintiff originally filed *Williams v. Sizer, et al.*, Civil Action No. JFM-05-2747 (D. Md.) on October 4, 2005, alleging that the Commissioner of the Division of Correction and the Warden of the Eastern Correctional Institution ("ECI") disregarded his complaints against the private health care provider at the ECI, and have, for all intents and purposes, maintained a "hands off policy" with regard to the provider's failure to provide adequate health care for his type II insulin-dependent diabetes ("IDDM") and heart disease. Paper No. 1. He claims that he has not received information regarding a treatment plan to manage the chronic and acute complications of diabetes and has not been provided: (1) necessary and adequate eye, kidney, and blood testing; (2) an individualized diabetic meal plan or educational program; (3) acceptable medical products, *e.g.*

---

[1] The Clerk shall amend the docket to substitute this name for that of defendant "Rose."

needles; and (4) adequate exercise. *Id*. Plaintiff asserts that the Commissioner and Warden's inaction has left him to suffer from the possible chronic complications of diabetes. *Id*.

Plaintiff was subsequently granted leave to amend his complaint to add Correctional Medical Services, Inc. ("CMS") and Dr. Razaak Eniola as party defendants, alleging that: the medical care provided to ECI diabetic and hypertensive inmates is inadequate; CMS's cost-cutting measures have resulted in unconstitutional treatment; medical staff has withheld the care noted in physician's orders; and CMS staff have abandoned acceptable standards of health care. *See* Paper Nos. 6 & 8. The court further directed the consolidation of this matter with plaintiff's other civil rights action against ECI health care providers.[2] *See Williams v. CMS, et al.*, Civil Action No. JFM-05-2941 (D. Md.).

Prior to the filing of defendants' dispositive motions, plaintiff was permitted to amend his complaint to raise additional issues regarding the medical defendants's alleged failure to adequately medicate and control his hypertension ("HTN"). *See* Paper Nos. 14 & 15.

On February 13 and February 27, 2006 respectively, defendants CMS, Ruttig, Eder, Blondeaux, Rose, Eniola, Jalali, and Daly ("medical defendants") and defendants Sizer and Green ("state defendants") filed motions to dismiss or, in the alternative, motions for summary judgment. Paper Nos. 20 & 22. Plaintiff filed an opposition response to the medical defendants' dispositive motion, prompting the filing of a reply and surreply. Paper Nos. 24, 25, & 30. In addition, Plaintiff filed an opposition response to the state defendants' dispositive motion, along with a motion to withdraw. Paper Nos. 32 & 33. Plaintiff was granted additional time to and including May 25, 2006, to obtain legal assistance and representation from Prisoner Rights Information Systems, Inc.

---

[2] The original and amended complaints in *Williams v. CMS, et al.*, Civil Action No. JFM-05-2941 (D. Md.), raised particularized claims against CMS and health care staff with regard to plaintiff's care and treatment for hypertension.

As of the within signature date, no further responsive pleadings have been filed by plaintiff. The case is ready for the court's consideration. Oral hearing is unnecessary. *See* Local Rule 105.6. (D. Md. 2004).

## Standard of Review

A court reviewing a complaint in light of a Rule 12(b)(6) motion accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997). Such a motion ought not to be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The court, however, need not accept unsupported legal conclusions or pleaded facts, or conclusory factual allegations devoid of any reference to particular acts or practices. *See Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989); *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-323. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[3] *Porter v. Nussle*, 534 U.S. 516, 532 (2002).   Plaintiff's complaint falls under the exhaustion prerequisites of § 1997e(a), and his claims must be dismissed unless he can show that he has satisfied the administrative exhaustion requirement or that defendants have forfeited their right to raise non-exhaustion as a defense.  *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd,* 98 Fed. Appx. 253 (4th Cir. June 2, 2004) (per curiam).  Under *Chase*, a Maryland inmate may satisfy exhaustion by seeking review of an Administrative Remedy Procedure ("ARP") complaint from the Warden to the Commissioner and then appealing the Commissioner's decision to the Inmate Grievance Office ("IGO"), the *final level* of appeal within Maryland's administrative grievance system for prisoners.[4]  *Id*. at 529 (emphasis added).

Further, where, as here, plaintiff presents an Eighth Amendment denial of medical care claim, he must prove two essential elements.  First, he must satisfy the "objective" component by

---

[3] The Supreme Court has recently expounded on the exhaustion issue, finding that prisoners must complete the administrative review process, using all steps that the agency holds out and doing so properly.  It concluded that proper exhaustion of administrative remedies demands compliance with an agency's deadlines and other critical procedural rules because "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Woodford v. NGO*, 126 S.Ct. 2378, 2385-86 (2006).

[4] Exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant.  *See Anderson v. XYZ Correctional Health Services, Inc*., 407 F.2d 674, 682 (4th Cir. 2005).

illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). There is no dispute that plaintiff suffers from hypertension and IDDM. Therefore, he has satisfied the first element. Plaintiff must then prove the second subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of prison officials or health care personnel. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. Health care staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167.[5]

Analysis

The state defendants primarily assert that the complaint is subject to dismissal due to plaintiff's failure to fully exhaust administrative remedies as required under 42 U.S.C. § 1997e(a).[6]

---

[5] Plaintiff is also suing the Commissioner and ECI Warden. Title 42 U.S.C. § 1983 liability on the part of supervisory defendants requires a showing that "(1) the supervisory defendants failed promptly to provide an inmate with needed medical care, (2) the supervisory defendants deliberately interfered with the prison doctors' performance, or (3) that supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations." *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (internal citations omitted); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984) (supervisory liability for an inmate's beating by prison guards).

[6] The medical defendants do not raise this ground as an affirmative defense. Therefore, the court considers the defense waived.

They claim that while plaintiff has filed grievances regarding his medical claim, he has not appealed the dismissal of these grievances to the IGO. The state defendants further assert that as supervisory officials they cannot be held liable under the doctrine of respondeat superior and they are entitled to rely on the judgments of medical personnel. On June 8, 2006, plaintiff filed a motion to withdraw his complaint against the state defendants, acknowledging that he has not exhausted his administrative remedies.[7] The motion to withdraw shall be granted.

The medical defendants raise two primary arguments under their Rule 12(b)(6) motion, alleging that plaintiff is not entitled to relief under any negligence or breach of contract theory. Defendant CMS further argues that it cannot be held liable under 42 U.S.C. § 1983 based upon a vicarious liability theory.[8] The medical defendants also state that plaintiff has received constitutionally adequate medical care.

Plaintiff claims that the medical defendants have intentionally submitted an "incomplete, fractional, and deficient" medical record. He maintains that his medical record is extensive and that at least one-half of his medical record has been withheld from the court.[9] Plaintiff points to a number of incidents where his blood pressure ("BP") was elevated and claims that no medical staff showed concern or provided him necessary medication. He continues to maintain that there were intervals where staff interfered with his HTN prescription and BP check regimen, thus causing a cycle of elevated BP. Plaintiff asserts that the mere fact that he was frequently examined by

---

[7] The state defendants do not oppose the motion.

[8] CMS became the medical contractor at ECI on July 1, 2005.

[9] Plaintiff has filed two motions to compel and for a scheduling order, claiming that the medical defendants continue to withhold his medical record from him. Paper Nos. 28 & 31. The motions shall be denied. A scheduling order has not been issued: thus, discovery is inappropriate in this case. *See* Local Rule 104.4. (D. Md. 2004); *see also* Fed. R. Civ. P. 26(a)(1)(E)(iii). Moreover, plaintiff has failed to show that he cannot file responsive pleadings to defendants' dispositive filings in the absence of discovery. Indeed, he has filed extensive responsive pleadings and exhibits in this case.


defendants shows nothing more than "documenting his worsening condition, and continuing the provision of ineffective medications...."[10]

According to the records, Plaintiff is a 6' 2" 53-year old male whose weight primarily fluctuates between 292 and 298 pounds. He was diagnosed with IDDM in February of 2005. At that time his hemoglobin A1C blood sugar level ("NgA1C") was within normal limits at 5.3%.[11] On June 12, 2005, Dr. Bruce Weaver examined plaintiff's eyes and found no signs of neurovascularization of the irides.[12] Weaver did find, however, that plaintiff required bifocals, which he received on June 29, 2005. According to the medical defendants plaintiff signed a release and opted not to see Weaver for an August 7, 2005 examination.

On July 13 and August 11, 2005, Nurse Rose Bryant performed a monthly diabetic assessment on plaintiff. Plaintiff offered no complaints of neurological problems and presented no signs or symptom of hypoglycemia or hyperglycemia (low or elevated blood sugar). *Id*. Plaintiff was educated on the need to increase his fluid intake in hot weather and on the consequences of high blood sugar levels on the kidneys. *Id*. At that time plaintiff was receiving 27 units of NPH insulin and 5 units of regular insulin in the morning and 17 units of NPH insulin and 5 units of regular insulin in the evening.

---

[10] The medical defendants dispute plaintiff's claims regarding the accuracy of the Medication Administration Records ("MARs") and attach the December, 2005 MARs which they claim were not available when their original summary judgment motion was filed in February, 2006. In his surreply, plaintiff again accuses the medical defendants of make false statements and providing a limited record.

[11] According to the medical records, an HgA1C measurement below 7.0% indicates that a patient's diabetes is under control, while a HgA1C measurement below 6.0% indicates a non-diabetic level.

[12] Dr. Eniola stats that Irides is the plural form of iris, the colored portion of the eye. Neurovascularization of the irides involves the formation of new blood vessels on the irides and is a complication of advanced diabetes.

On September 19, 2005, plaintiff's HgA1C test was at 5.2%, within normal limits. *Id.* While in the ECI infirmary from October 31 to November 14, 2005, plaintiff's blood sugar levels were monitored by the fingerstick method and he received additional insulin on a sliding scale basis as needed to control his blood sugar. *Id.* Plaintiff's HgA1C was next taken on December 15, 2005, with a 5.4% result. The medical defendants state that as of January 27, 2006, plaintiff showed no signs or symptoms of any complications of IDDM. *Id.*

Plaintiff also has a history of HTN that is hard to manage. On July 13, 2005, Dr. Seyed Jalali ordered daily dosages of Vasotec, HCTZ, and Calan to control plaintiff's HTN. On September 14, 2005, Physician's Assistant Maryam Messforosh increased the dosage of plaintiff's HCTZ and Calan and discontinued the Vasotec. On September 17, 2005, plaintiff complained of dizziness and asked that his medication be reviewed. Plaintiff's blood pressure ("BP) was found to be extremely elevated (199/111). Medications were provided and 30 minutes later plaintiff's BP was rechecked and again found to be elevated (198/113). Nurse Dorothy Ruffin instructed plaintiff to take his medications and to request a BP check when he appeared in the morning for his insulin.

Plaintiff's HTN remained uncontrolled on September 19, 2005. Messforosh noted that plaintiff had no complaints of chest pain, shortness of breath, dizziness, nausea, or vomiting. She ordered an immediate dosage of Catapres, twice a day BP checks, and dosages of Catapres for the next three days, with an additional dosage of Catapres if plaintiff's BP was over 180 systolic and 120 diastolic. Messforosh again saw plaintiff on September 22, 2005, and noted that while plaintiff denied chest pain and shortness of breath, he felt slightly tired and his BP remained elevated. She modified the medication order to increase the dosage of Calan and Catapress, continued the twice daily BP checks for three days and, if plaintiff's pressure was over 180/120, recommended that he be given an additional dosage of Catapres. On September 26, 2005, plaintiff was examined.

8

Although he told Messforosh that he complained that he was not receiving his HTN medications on time, his BP was 139/93. Messforosh renewed the orders written on September 22, 2005.

Dr. Eniola ordered plaintiff to the infirmary for observation of his BP on September 29, 2005. Plaintiff's BP was closely monitored for the two to three days he remained in the infirmary. The medical defendants state that additional dosages of Catapres were administered as needed to lower plaintiff's BP. Over the course of the next month: (1) nurses continued to monitor plaintiff's BP twice a day and to give him additional Catapres as need; (2) Dr. Jalali modified plaintiff's HCTZ and Catapres dosages; and (3) plaintiff was examined by physicians on October 12 and October 27, 2005, and was found to have highly elevated BP. An additional dose of Catapres was administered and Dr. Eniola increased plaintiff's Catapres regimen. On October 31, 2005, plaintiff's BP was 180/107. An additional dose of Catapres was administered and 35 minutes later his BP had decreased to 155/101. Dr. Jalali was notified and plaintiff was admitted to the infirmary for management of his HTN.

Plaintiff remained in the infirmary from October 31 to November 14, 2005. According to the record his blood pressure remained under better control while assigned to the infirmary, except in the morning. In response, Dr. Jalali increased plaintiff's nighttime Calan dosage.

On November 22, 2005, plaintiff was seen by Dr. Jalali with an elevated BP. He denied any headache, shortness of breath, chest pain, or visual disturbances. On December 15, 2005, when plaintiff's BP was found to be elevated, he was given extra doses of Catapres and was placed on pill call[13] for all his HTN medication.

On January 5, 2006, plaintiff complained of a headache. His BP was 196/101. He was admitted to the infirmary for observation. Upon examination the next day, plaintiff's BP was

---

[13]   Pill call requires an inmate to report to the dispensary to receive his medication, rather than being given the medications to take on his own.

150/88, and he was discharged to his housing unit. *Id.* On January 12, 2006, plaintiff's BP was checked five hours after a dose of Catapres had been administered for a BP of 178/90 and found to be 148/74. According to medical defendants, since January 27, 2006, plaintiff's BP has been within normal limits and he continues to receive additional doses of Catapres in accordance with his BP monitoring. *Id.*

The record shows that from July 1, 2005, to the filing of responsive pleadings, plaintiff's IDDM has been monitored and controlled through HgA1C blood sugar level and fingerstick testing and doses of insulin. Further, his examinations were unremarkable for any IDDM-related eye condition. The medical defendants fail, however, to provide a substantive respond to plaintiff's complaints regarding diets regimens, kidney-function testing, and medical products.

Further, while chronic high BP can pose serious risks, the condition may be managed through medication and diet. The record shows that: plaintiff's BP was repeatedly checked and monitored while he was in general population; he was at least twice been placed in the infirmary to monitor his HTN; his HCTZ, Canan, and Catapres medications have been repeatedly adjusted in a better attempt to control his HTN and to ameliorate any side-effects, *e.g.* allergies; he was placed on a low-sodium diet; and he has been repeatedly examined by nurses, physician's assistants, and physicians in an attempt to control his HTN. It seems to the court that the primary factual disputes as to the HTN claims go to: (1) the causative factor for plaintiff's elevated BP readings;[14] (2) what, if any, objective symptoms or complications he experienced from chronic HTN;[15] and (3) whether all relevant medical records have been provided to the court.

---

[14] Both the medical defendants and plaintiff opine that the elevated BP readings could be caused by "non-compliance."

[15] Plaintiff claims that on or about September 30, 2005, he passed out from elevated BP. The medical defendants, however, state that plaintiff has shown no objective signs or symptoms of any complications from the HTN.

The medical defendants have failed to respond to a number of plaintiff's IDDM claims. Further, there are remaining questions regarding the sufficiency of the record regarding plaintiff's care for HTN. Consequently, the medical defendants' summary judgment motion shall be denied without prejudice. They shall be required to file a status report as to the current protocols and treatment plan for plaintiff's HTN care.[16] A separate Order follows.

/s/
J. Frederick Motz
United States District Judge

---

[16] The medical defendants may renew their motion for summary judgment at that time. Any dispositive filing should be accompanied by *all* relevant medical records, including, but not limited to, progress notes, MARs, physician's orders, chronic care notes, and sick-call requests