IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTHONY LAMONT WILLIAMS | * | |
| Plaintiff, | * | |
| v. | * | CIVIL ACTION NO. JFM-05-2747, et seq. |
| | * | |
| FRANK C. SIZER, COMMISSIONER, | * | |
| KATHLEEN GREEN, WARDEN | * | |
| CORRECTIONAL MEDICAL SERVICES, | * | |
| INC. | * | |
| DR. RAZAAK ENIOLA | * | |
| RUTH ANN RUTTIG | * | |
| SUZANNE B. EDER | * | |
| ROBIN BLONDEAUX | * | |
| CHARGE NURSE ROSEMARY | * | |
| BRYANT | * | |
| DR. SEYED JALALI | * | |
| JENNIFER DALY | * | |
| Defendants. | * | |
| | ***** | |

MEMORANDUM

1. Procedural History

Plaintiff originally filed *Williams v. Sizer, et al.*, Civil Action No. JFM-05-2747 (D. Md.)

on October 4, 2005, alleging that the Commissioner of the Maryland Division of Correction

("DOC") and the Warden of the Eastern Correctional Institution ("ECI") disregarded his complaints

against the private health care provider at the ECI and have engaged in a "hands off policy" with

regard to the provider's failure to provide adequate health care for his type II insulin-dependent

diabetes ("IDDM") and heart disease. Paper No. 1. He claims that he has not been informed of a

treatment plan to manage the chronic and acute complications of diabetes and has not been provided:

(1) necessary and adequate eye, kidney, and blood testing; (2) an individualized diabetic meal plan

or educational program; (3) acceptable medical products; and (4) adequate exercise. *Id*. Plaintiff

asserts that the Commissioner and Warden's inaction has left him to suffer from the possible chronic complications of diabetes.  *Id.*

Plaintiff was subsequently granted leave to amend his complaint to add Correctional Medical Services, Inc. ("CMS") and Dr. Razaak Eniola as party defendants, alleging that the medical care provide to ECI diabetic and hypertensive inmates is inadequate and CMS's cost-cutting measures have resulted in unconstitutional treatment, the withholding of care as directed  in physician's orders, and the failure of CMS staff to meet acceptable standards of health care.  *See* Paper Nos. 6 & 8.   The court directed the consolidation of this matter with plaintiff's other civil rights action against ECI health care providers.[1]  *See Williams v. CMS, et al.*, Civil Action No. JFM-05-2941 (D. Md.).  Finally, plaintiff was permitted to amend his complaint to raise issues regarding defendants' alleged failure to adequately medicate and control his hypertension ("HTN").  *See* Paper Nos. 14 & 15.

Defendants CMS,[2] Ruttig, Eder, Blondeaux, Rose, Eniola, Jalali, and Daly ("medical defendants") and defendants Sizer and Green ("state defendants") filed motions to dismiss or, in the alternative, motions for summary judgment.  Paper Nos. 20 & 22.  Reply briefing was filed.  Paper Nos. 24, 25, 30, & 32.  In addition, Plaintiff filed a motion to withdraw his claims against the state defendants.  Paper No. 33.  On August 1, 2006, the court granted plaintiff's motion to withdraw defendants Sizer and Green from the case,[3] denied the medical defendants' dispositive motion

---

[1]     The original and amended complaints in *Williams v. CMS, et al.*, Civil Action No. JFM-05-2941 (D. Md.), raised particularized claims against CMS and health care staff with regard to plaintiff's care and treatment for hypertension ("HTN").

[2]     As previously noted by this court, CMS became the medical contractor at ECI on July 1, 2005.

[3]     By separate order, the claims against defendants Sizer and Green shall be dismissed.

2

without prejudice,[4] and ordered the medical defendants to file a status report as to the current protocols and treatment plan for plaintiff's HTN care.[5]

2. Pending Motions

The medical defendants have filed a renewed motion to dismiss or for summary judgment and plaintiff has filed a response thereto.[6]   Paper Nos. 38 & 42.   The case may be determined without oral hearing.   *See* Local Rule 105.6. (D. Md. 2004).   For reasons to follow, the medical defendants' dispositive motion, construed as a motion for summary judgment, shall be granted.

3. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The moving party bears the burden of showing that there is no genuine issue as to any material fact.   No genuine issue of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof.   *Celotex*, 477 U.S. at 322-323.   Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

---

[4]     The court found the medical defendants had failed to respond to a number of plaintiff's IDDM claims.   It further concluded that plaintiff had called into question the sufficiency of the record regarding his care for HTN.

[5]     The medical defendants were also offered the option of renewing their motion for summary judgment.

[6]     Subsequent to the filing of the medical defendants' renewed dispositive motion, plaintiff filed a motion for preliminary and permanent injunction and a motion to amend.   Paper Nos. 40 & 41.

3

Where, as here, plaintiff presents an Eighth Amendment denial of medical care claim, he must prove two essential elements.  First, he must satisfy the "objective" component by illustrating a serious medical condition.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998).   Plaintiff suffers from hypertension and IDDM.  Therefore, he has satisfied the first element.   Plaintiff must then prove the second subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of health care personnel.  *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837.  Healthcare staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167.

4.  <u>Analysis of Medical Claims</u>

<u>IDDM</u>

The record presented to the court shows the following.  Plaintiff is a 6' 2" 53-year old male whose weight fluctuates between 287 and 298  pounds.  He was  diagnosed with IDDM in February of 2005.  At that time his hemoglobin A1C blood sugar level ("NgA1C") was within normal limits

at 5.3%.[7]  In 2005, Dr. Bruce Weaver performed an eye examination on plaintiff and found no signs

of neurovascularization of the irides.[8]  Weaver did find, however, that plaintiff required bifocals.

*Id*.  Plaintiff received the eye glasses.  According to the medical defendants plaintiff signed a release

and opted not to see Weaver for an August 7, 2005 examination.

Plaintiff is subject to monthly diabetic assessments.  He offered no complaints of any

neurological problems or signs and symptoms of hypoglycemia or hyperglycemia (low or elevated

blood sugar).  Plaintiff was educated on the need to increase his fluid intake in hot weather and on

the consequences of high blood sugar levels on the kidneys.  In August of 2005, plaintiff was

receiving 27 units of Novolin NPH insulin[9] and 5 units of regular insulin[10] in the morning and 17

units of NPH insulin and 5 units of regular insulin in the evening.

Plaintiff's HgA1C tests taken during 2005 and 2006, were between 5.2-5.4%, indicating that

his IDDM is well-controlled.  He is receiving a 2400 calorie a day diet designed by the American

Diabetes Association ("ADA") to help keep his diabetes under control.  Plaintiff's blood sugar levels

are monitored by the fingerstick method.  Recent records indicate that plaintiff receives 27 units of

NPH insulin in the morning and 20 units in the evening to treat his IDDM  Additionally, plaintiff

receives doses of regular insulin, according to a sliding scale, if his blood sugar is elevated when

---

[7]     An HgA1C measurement below 7.0% indicates that a patient's diabetes is under control, while a HgA1C measurement below 6.0% indicates a non-diabetic level.

[8]     Irides is the plural form of iris, the colored portion of the eye.  Neurovascularization of the irides involves the formation of new blood vessels on the irides and is a complication of advanced diabetes.

[9]     NPH is an intermediate-acting insulin which provides extended insulin coverage.  It has an onset of action of two to four hourse, reaches its peak effect in six to ten hours, and lasts ten to sixteen hours.

[10]     Regular insulin is short-acting insulin.  It has an onset of action of 30 to 60 minutes, a peak effect of two to three hours, and lasts up to six hours.

tested by fingerstick method twice a day.   Plaintiff's blood sugars have been elevated only a few times and he has received insulin for those readings.  Plaintiff was transferred from ECI to the Metropolitan Transition Center ("MTC") in July of 2006.  His ADA diet and his insulin medication were renewed by Dr. Zerabruck Tewelde.  In August of 2006, Dr. Tewelde noted that plaintiff's IDDM was well-controlled.  His diet, exercise, and medications was discussed.   On September 6, 2006, plaintiff's blood was tested and the results indicate that his IDDM is under control and that there is no sign of kidney damage due to his IDDM or HTN.

The record shows that plaintiff has been educated about his IDDM and placed on a medically-appropriate diet.  He has failed to adequately refute the medical defendants' verified exhibits which show his diabetes is monitored and controlled with medication and he shows no signs or symptoms of any complications of IDDM.

HTN

Plaintiff also has a history of hypertension and a review of the responsive pleadings shows that throughout 2005, there was difficulty in controlling his HTN, resulting in modifications to his HTN medication regimen of Vasotec, HCTZ, and Calan and by augmenting his regimen with Catapres, conducting  twice-a-day blood pressure checks, admitting him to the ECI infirmary in October and November of 2005, in order to closely monitor his blood pressure, and placing him on pill call[11] for all his hypertension medication.

In January of 2006, plaintiff experienced elevated blood pressure levels at least twice, causing healthcare staff to admit him to the ECI infirmary for observation for a twenty-four hour

---

[11]    Pill call requires an inmate to report to the dispensary to receive his medication, rather than being given the medications to take on his own.

period and to have blood pressure checks administered after a dosage of Catapres was provided. Plaintiff's blood pressure was for the most part within normal limits through February of 2006. When elevated, additional clonidine was provided.   In May of 2006, Dr. Gursawa Pablo added Vistaril to plaintiff's medication regimen.  According to Dr. Pablo, plaintiff's HTN was responding well to the addition of Vistaril.

Upon transfer to MTC, plaintiff was examined by Dr. Tewelde on January 27, 2006, in the Chronic Care Clinic ("CCC").  His blood pressure was 122/72, an "optimal" reading according to the health care provider.  Dr. Tewelde characterizes plaintiff as a "difficult" patient, who demanded blood pressure checks every six hours and who refused to allow a change to his HTN prescription regimen which, in Tewelde's opinion, would alleviate the need for plaintiff to receive additional dosages of Clonidine for blood pressure elevations.   In August of 2006, Tewelde again examined plaintiff in the CCC.  Plaintiff continued to ask that his blood pressure be checked three times a day, but agreed to certain changes in his HTN medication regimen.  As a result, the dosage of the diuretic medication (HCTZ) was reduced and Tewelde ordered hydralazine, another anti-hypertensive medication, to be provided to plaintiff in addition to his Clonidine and Calan.  Plaintiff's Clonidine, as needed for elevated blood pressure readings, was not renewed.

The records show that plaintiff's blood pressure is routinely checked and monitored while in general population, albeit not with the thrice-daily frequency he has requested.  He has at least twice been placed in the infirmary to get a better handle on his hypertension, placed on pill call to ensure that he is personally receiving his medication, and had his medication adjusted in a better attempt to control his hypertension and to alleviate any subjective complaints.  He is on a regimen

of HCTZ, hydralazine, Calan, and Catapres.  Plaintiff shows no objective signs or symptoms of any complications from chronic HTN.

     5.  <u>Conclusion</u>

     There is no doubt that inmates in the Maryland DOC have serious medical needs. Like the population at large, inmates entering DOC facilities suffer from diseases such as asthma hypertension, diabetes, and tuberculosis.  Upon entering the prison environment, inmates may experience the full ambit of medical problems, ranging from the routine to the life-threatening.  It is arguable that many serious health disorders such as diabetes, hypertension, and cardiac problems, as well as risk factors for communicable diseases, are disproportionately represented in the prison population due to prior lifestyles, prior economic factors, and prior access to medical care.  These problems are exacerbated by the nature of the prison environment and its aging prison population.

     This being said, the court finds defendants have not been deliberately indifferent to plaintiff's serious medical conditions.[12]  Plaintiff is 55 years old, obese, and was diagnosed with IDDM and HTN.  His IDDM is under control with varied insulin dosages and a prescribed ADA diet.  He has had no complications resulting from that condition.  While control of his HTN has proved to be more elusive, he has been under the care of prison doctors, physician's assistants, and nurses who have addressed his sick-call complaints and continue to monitor and manage his HTN through routine

---

[12]    To the extent that plaintiff is alleging that the medical defendants violated the proper standards of medical care and is raising a claim of medical malpractice, the court declines to exercise its pendent jurisdiction over same.  First, the medical defendants are entitled to judgment as to plaintiff's federal civil rights claims. *See* 28 U.S.C. §1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Second, there is no evidence that plaintiff has first exhausted his medical negligence claims as required. *See* Maryland Health Care Malpractice Claims Act, Md. Code. Ann., Cts. & Jud. Proc., § 3-2A-01, *et seq.*; *Estate of Alcalde v. Deaton Specialty Hosp. Home.,* Inc., 133 F.Supp.2d 702, 710-11 (D. Md. 2001).

CCC visits, blood pressure checks, and adjustments to his medication.  No Eighth Amendment

violation has been demonstrated and the medical defendants are entitled to judgment.[13]

A separate order effecting the rulings made in this memorandum is being entered herewith.


Date:   August 6, 2007                              /s/_____
                                                    J. Frederick Motz
                                                    United States District Judge

---

[13]     At the eleventh hour plaintiff seeks leave to amend the complaint to include Dr. Tewelde as a defendant.  Paper No. 41.  Given the history of plaintiff's prior amended complaints, defendants' responsive pleading, and the materials before the court, plaintiff shall not be granted leave to amend.  Further, plaintiff seeks injunctive relief, complaining about the medical treatment he has received at MTC with regard to his IDDM and, in particular, his HTN.  Paper No. 40.  After consideration of his allegations and the record, the court finds that injunctive relief is not warranted.  *See Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 195-96 (4th Cir. 1977).  The medical defendants shall, however, be required to provide a status report regarding plaintiff's recent IDDM and HTN evaluations, testing, and medication regimen.